Case No. 25-11778-A

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

FREDDIE CAGLE,
Appellee-Plaintiff,

v.

NATIONAL INDEMNITY COMPANY OF THE SOUTH,
Appellant-Defendant.

---

Appeal from the United States District Court
for the Northern District of Georgia, Gainesville Division
Case No. 2:23-cv-00140-RWS

### **Appellee-Plaintiff Freddie Cagle's Brief**

Mark Alexander
STEWART, MELVIN & FROST, LLP
P.O. Box 3280
Gainesville, Georgia 30503
Tel: 770-536-0101

Andrew Q. Gould
PRINCENTHAL MAY & WILSON
750 Hammond Dr.
Building 12 Suite 200
Sandy Springs, GA 30328
Tel: 678-534-1980

Naveen Ramachandrappa
E. Allen Page
BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, NW
Suite 3900
Atlanta, GA 30309
Tel: 404-881-4100

*Attorneys for Appellee-Plaintiff Freddie Cagle*

*Case No. 25-11778-A*
*Cagle v. Nat'l Indemnity Co. of the South, et al.*

## __Certificate of Interested Persons & Corporate Disclosure Statement__

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Appellee-Plaintiff Freddie Cagle provides the following Certificate of Interested Persons listing all persons and entities known to this filer to have an interest in the outcome of this appeal:

1. American Property Casualty Insurance Association (Amicus)

2. Alexander, Mark (Counsel for Appellee)

3. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC (Counsel for Appellant National Indemnity Company of the South)

4. Barber, Mark (Counsel for Appellant National Indemnity Company of the South)

5. Barclay Damon, LLP (Counsel for Appellant National Indemnity Company of the South)

6. Berkshire Hathaway, Inc. (Parent corporation of Appellant National Indemnity Company of the South) [ticker symbol, "BRK.B"]

7. Bondurant, Mixson & Elmore, LLP (Counsel for Appellee)

C-1 of 3

*Case No. 25-11778-A*
*Cagle v. Nat'l Indemnity Co. of the South, et al.*

8.  Bovis, Kyle, Burch & Medlin (Counsel for Amicus Canal Insurance Company)

9.  Bryant, Randy (Counsel for Amicus Canal Insurance Company)

10. Cagle, Freddie (Appellee)

11. Canal Insurance Company (Amicus)

12. Demasi, Melody (Counsel for Appellant National Indemnity Company of the South)

13. Duane Morris LLP (Counsel for Amicus American Property Casualty Insurance Association)

14. Ellis, Danny (Counsel for Appellee)

15. Gould, Andrew (Counsel for Appellee)

16. Hostetter, Michael (Counsel for Amicus Trucking Industry Defense Association).

17. Jackson, Kim M. (Counsel for Amicus Canal Insurance Company)

18. Morris, Ryan F. (Counsel for Amicus American Property Casualty Insurance Association)

C-2 of 3

*Case No. 25-11778-A*
*Cagle v. Nat'l Indemnity Co. of the South, et al.*

19. Nall & Miller, LLP (Counsel for Amicus Trucking Industry Defense Association).

20. National Indemnity Company of the South (Appellant)

21. Page, E. Allen (Counsel for Appellee)

22. Palumbos, Robert M. (Counsel for Amicus American Property Casualty Insurance Association)

23. Princenthal, May & Wilson, LLC (Counsel for Appellee)

24. Ramachandrappa, Naveen (Counsel for Appellee)

25. Rabinovich, Laurence (Counsel for Appellant National Indemnity Company of the South)

26. Stewart, Melvin & Frost, LLP (Counsel for Appellee)

27. Story, Richard (U.S. District Judge)

28. Truck Wreck Justice, PLLC (Counsel for Appellee)

29. Trucking Industry Defense Association (Amicus)

C-3 of 3

## Statement Regarding Oral Argument

Mr. Cagle also requests this Court schedule oral argument, but not for the reason National Indemnity does. Absent direct guidance from this Court on all pertinent issues, we anchor our request—like our Argument—in the plain language of the source documents that govern the Appeal.

Those source documents include first and foremost the federally-pre-scribed MCS-90 endorsement attached to the National Indemnity's insur-ance policy that covered the negligent motor carrier that injured Mr. Cagle. Beyond the endorsement itself are the statutes and regulations providing for and, in some instances, dictating how the MCS-90 operates.

Below, both parties (across some thirteen summary judgment briefs) and the district court (in its 56-page order) largely relied on non-binding precedent to explain how the MCS-90 and regulations operate. National In-demnity does the same on Appeal. Its lead argument revolves around a sin-gle, thirty-year-old case from the District of New Hampshire, *Northland In-surance Co. v. New Hampshire Insurance Co.*, 63 F. Supp. 2d 128 (D.N.H. 1999), which it addresses across four pages of briefing. *See* 11th Dkt. 30 at 39–42. So too the Amici. *See* 11th Dkt. 42 at 13–14; 11th Dkt. 43 at 12–13. (As we will show, the insurers misread even that case.)

i

But in the wake of the insurers' outcry—in which they claimed that the district court's order will (among other things) "cause a significant disruption in insurance markets," 11th Dkt. 30 at 5.[1]—we revisited the source texts and took a careful look at their terms. Our review revealed that words of those texts don't mean what the insurers think (or say) they mean.

Take one quick example. Amicus Canal Insurance claims that 49 C.F.R. § 387.313T(d) "include[s] procedures for an insurer to cancel its MCS-90 *endorsement* and *certificate of insurance*." 11th Dkt. 42 at 12 (emphasis added). But if the Court simply reads § 387.313T(d) (which we recite in full in the Brief), it will see that, while the provision indeed addresses "certificates of insurance," it never mentions "endorsements."

We address why that matters in the Argument, but here, we flag it to illustrate that the other side's clamor isn't text-based. The insurers want to perpetuate an industry-friendly interpretation of these texts, if for no other reason than because that is what "[i]nsurers [e]xpect." 11th Dkt. 39 at 16.

---

[1] Apparently, the order will also put "unnecessary strain on the commercial carrier insurance market," and force "Georgia trucking companies… to pay higher premiums." 11th Dkts. 39 at 8; 43 at 14. Though beside the point, suffice it to say no evidence in the record supports those contentions.

Expectations aside, the MCS-90's and pertinent regulations' plain language demands affirming the district court's holdings on all the issues. We have endeavored to outline that as clearly as we can for the Court's benefit in our Brief. That is why, as the Court will see, for each substantive issue, we begin by analyzing the plain language.

But, in part because we have only this one opportunity to counter five insurer briefs, we still believe oral argument will help the Court cut through the insurers' sound and fury and center its analysis where it should: in the texts' plain language. Accordingly, Mr. Cagle requests oral argument.

**Table of Contents**

**Statement of the Issues** ........................................................................1

**Statement of the Case** .........................................................................1

    A. *Cagle I*: Judgment Against One Way ...................................3

    B. One Way's Two Insurers Provide Surety Obligations ....................4

    C. *Cagle II*: Judgment Against One Way's Insurers ..............................7

    D. National Indemnity's Appeal...............................................8

    E. Standard of Review..............................................................9

**Summary of the Argument**....................................................................9

**Argument and Citations of Authority** ...............................................11

    \* **The MCS-90 Endorsement** ........................................................11

    1. **National Indemnity's MCS-90 remained in effect.** ...........................14

        A. National Indemnity abandoned this issue by failing to challenge the district court's second ground for its holding........14

        B. By its text, National Indemnity's MCS-90 remained in effect......15

        C. Per the regulations, Old Republic' "certificate" didn't terminate National Indemnity's "endorsement." ..........................17

        D. Caselaw confirms the regulations' plain meaning. .......................23

    2. **The *Cagle I* judgment against One Way triggered National Indemnity's MCS-90 liability.**....................................................28

        A. The MCS-90's text sets the requirements for liability....................29

        B. Under the plain-text, the *Cagle I* judgment satisfies the MCS-90's requirements. ...............................................................33

iv

C.  Though unnecessary, additional evidence from *Cagle II* further confirms that the judgment triggers the MCS-90. ............36

D.  National Indemnity's "authority" limitation has no basis in the endorsement, regulations, caselaw, or policy. ....................40

E.  At most, there is a fact question about which entity's "authority" was being used at the time of the wreck...................47

3.  **Mr. Cagle can recover under National Indemnity's MCS-90 despite the possibility of other recovery.**...............................................**48**

A.  The MCS-90 and regulations allow plaintiff to recover from multiple MCS-90s and for more the federal *minimums*.................49

B.  Caselaw confirms that plaintiffs can recover from multiple MCS-90s and more than the federal *minimums*. .............................52

C.  National Indemnity's cases don't demand a different result.......54

4.  **The Court should affirm the discretionary holding that judicial estoppel doesn't preclude recovery.**........................................**57**

**Conclusion**........................................................................................................**59**

v

## Table of Citations

### Record Citations

In general, "Dkt." refers to the record below in *Cagle II*. When citing to this Court's docket, we refer to the "11th Dkt." And when citing to the underlying opinion from Cagle I, N.D.Ga. No. 2:21-CV-52, we cite to "*Cagle I*, Dkt."

### Statutes & Regulations

49 U.S.C. § 31139(b)(1) ...............................................................34, 40

49 C.F.R. § 387.15.............................................................................22

* 49 C.F.R. § 387.313 ............................................... ii, 18, 21–23, 27, 50

49 C.F.R. § 387.5.............................................................................30

* 49 C.F.R. § 387.7 .......................................... 18–19, 21–22, 41, 50–51

49 C.F.R. § 390.21 ...........................................................................41

### Case Law

*Aequicap Ins. Co. v. Canal Ins. Co.*,
   303 Ga. App. 508 (2010).................................................................12

*AFC Franchising, LLC v. Purugganan*,
   43 F.4th 1285 (11th Cir. 2022)..........................................................3

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) .......................................................47

*Am. Auto. Ins. Co. v. Transp. Ins. Co.*,
   03-72989, 2005 WL 8165556 (E.D. Mich. Feb. 15, 2005)...............27

*Anthony v. Georgia*,
   69 F.4th 796 (11th Cir. 2023)..........................................................15

*Auto-Owners Ins. Co. v. Monroe*,
   614 F.3d 322 (7th Cir. 2010) ..........................................................45

*Bonner v. City of Prichard,*
    661 F.2d 1206 (11th Cir. 1981) ..................................................................42

*Canal Ins. Co. v. Coleman,*
    625 F.3d 244 (5th Cir. 2010) ...........................................13, 34–35, 40

*Canal Ins. Co. v. Distrib. Servs., Inc.,*
    320 F.3d 488 (4th Cir. 2003) ..................................................................46

*Carolina Casualty Insurance Co. v. Cap. Trucking, Inc.,*
    523 F. Supp. 3d 661 (S.D.N.Y. 2021) ...............................................45, 53, 56

*Carolina Casualty Insurance Co. v. E.C. Trucking,*
    396 F.3d 837 (7th Cir. 2005) ..................................................................32, 43

*Carolina Cas. Ins. Co. v. Est. of Karpov,*
    559 F.3d 621 (7th Cir. 2009) ..................................................................45

* *Carolina Casualty Insurance Co. v. Underwriters Insurance Co.,*
    569 F.2d 304 (5th Cir. 1978) ..........................................................42–43, 52, 57

*Carolina Casualty Insurance Co. v. Yeates,*
    584 F.3d 868 (2009) ..................................................................56–57

* *Empire Fire & Marine Insurance Co. v. J. Transport, Inc.,*
    880 F.2d 1291 (11th Cir. 1989) ..........................................................23–24, 52

*Fairmont Specialty Ins. Co. v. 1039012 Ontario, Inc.,*
    2:10 CV 070, 2011 WL 3651333 (N.D. Ind. Aug. 19, 2011) ........32, 44–45, 53

*Hamm v. Canal Ins. Co.,*
    10 F. Supp. 2d 539 (M.D.N.C. 1998) ..............................................45

*Herrod v. Wilshire Ins. Co.,*
    499 F. App'x 753 (10th Cir. 2012) ..........................................................30, 44

*Lancer Ins. Co. v. Rockmore,*
   3-04-CV-0022-K, 2005 WL 8158370 (N.D. Tex. Oct. 14, 2005) ...................26

**\*** *Miller v. Harco Nat'l Ins. Co.,*
   241 F.3d 1331 (11th Cir. 2001) .................................... 11, 13, 15–16, 32, 42, 49

*Miller v. Harco Nat'l Ins. Co.,*
   274 Ga. 387 (2001) .........................................................................................32

*Miller v. Harco Nat'l Ins. Co.,*
   280 F.3d 1353 (11th Cir. 2002) .......................................................................32

*Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.,*
   796 F.3d 717 (7th Cir. 2015) ...........................................................................41

**\*** *National Specialty Insurance Co. v. Martin-Vegue,*
   644 F. App'x 900 (11th Cir. 2016) ................................................30, 36–38, 56

*Northland Insurance Co. v. New Hampshire Insurance Co.,*
   63 F. Supp. 2d 128 (D.N.H. 1999) ......................................................... i, 25–28

*Progressive Hawaii Ins. Corp. v. D&N Transp., Inc.,*
   4:20-CV-02726, 2022 WL 18396217 (S.D. Tex. Dec. 1, 2022) .......................16

*Progressive Mountain Ins. Co. v. Madd Transp., LLC,*
   633 F. App'x 744 (11th Cir. 2015) ..................................................................12

*Sapuppo v. Allstate Floridian Ins. Co.,*
   739 F.3d 678 (11th Cir. 2014) .........................................................................15

*United States v. Munoz,*
   112 F.4th 923 (11th Cir. 2024)........................................................................59

*Young v. Grand Canyon Univ., Inc.,*
   980 F.3d 814 (11th Cir. 2020) .........................................................................11

## Statement of the Issues

Though National Indemnity lists *five* issues in its Statement, its Argument centers around *four* issues corresponding to four sections in the district court's Order [Dkt. 113].[2] So, we state (and argue) those four issues.

**1.** Whether the district court erred in holding that National Indemnity's MCS-90 endorsement remained in effect at the time of the wreck. (**No.**)

**2.** Whether the district court erred in holding that the judgment against One Way triggers National Indemnity's MCS-90. (**No.**)

**3.** Whether the district court erred in holding that Mr. Cagle can recover under National Indemnity's MCS-90 regardless of whether he (or others) could possibly recovery under other MCS-90s. (**No.**)

**4.** Whether the district court abused its discretion in holding that judicial estoppel doesn't bar Mr. Cagle's recovery.  (**No.**)

## Statement of the Case

This appeal stems from judgment (in *Cagle II*) against insurer National Indemnity for its obligation to satisfy the judgment (from *Cagle I*) against its

---

[2] Issue 1 corresponds to the district court's Section D. Dkt. 113 at 38–41. Issue 2 corresponds to Section C. *Id.* at 29–38. Issue 3 corresponds with Section F. *Id.* at 49–55. And Issue 4 corresponds with Section B.1.B. *Id.* at 25–28.

insured, a negligent motor carrier, One Way Hauling Express. (The same district judge presided over both cases.) Mr. Cagle seeks to recover under the governing language of the applicable, federally-mandated MCS-90 endorsement attached to National Indemnity's policy with One Way.

Mr. Cagle's injury isn't at issue. Most of the relevant facts are undisputed. (When viewed properly, all material facts are undisputed.)

Yet, National Indemnity improperly injects argument into its Statement of the Case. For example, at the outset, it states that the applicable regulations seek to ensure that "there is a reliable source of recovery for a plaintiff *in the amount of* $750,000[.]" 11th Dkt. 30 at 17 (emphasis added). So too its conclusion that the district court's holding triggered "*three* different MCS-90 endorsements issued by *three* different insurers to *two* different motor carriers." *Id.* (emphasis in original); *see also id.* at 30 (mischaracterizing the district court's holding). Those are legal arguments masquerading as facts, and as we explain below, misleading.

We reserve our argument for our Argument section. Here, we simply recite the facts pertinent to the underlying judgment and National Indemnity's liability for that judgment according to the MCS-90's terms.

### A.    *Cagle I*: Judgment Against One Way[3]

In July 2019, Freddie Cagle was injured in a wreck on I-85 caused by a tractor-trailer. Mr. Cagle first sued the driver and two entities identified in the incident report—King's Way and First Time—as well as Wesco Insurance Company, which insured First Time. *Cagle I*, Dkt. 54 at 2.

Discovery revealed that the identified entities were part of a family-owned web of interrelated trucking companies—what the district court called "chameleon" carriers—all operated by a man named Calzada and his wife. *See e.g.*, Dkt. 71 at 5–6 n.4. Mr. Cagle amended his complaint to add claims against Calzada, his wife, and those other entities, One Way and AC Nationwide, along with Old Republic Insurance Company, which insured One Way. *Cagle I*, Dkt. 56.

Undefended by their insurers, the Calzada-affiliated entities, including One Way, either failed to participate or stopped, and were found in default. *Cagle I*, Dkts. 107, 124. Mr. Cagle's allegations were deemed admitted

---

[3] *See* N.D.Ga. No. 2:21-CV-52 (*Cagle I*). Where convenient, we cite to the record below—*i.e.*, in *Cagle II*. Where a *Cagle I* filing does not exist in the *Cagle II* record, we cite to *Cagle I*. This Court can take judicial notice of those public records. *See, e.g. AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1297 n. 2 (11th Cir. 2022) (Tjoflat, J., concurring).

against them. The insurers, meanwhile, were dismissed from the case.[4]

After holding a hearing, *Cagle I*, Dkt. 147, the district court detailed his findings of fact and conclusions of law. *Cagle I*, Dkt. 142. National Indemnity notes that the district court found the defendants liable for illegal brokering. 11th Dkt. 30 at 26. But the district court also found that each defaulting entity—including One Way—was both directly liable for its own negligence and vicariously liable for the driver's negligence. *Cagle I*, Dkt. 142 at 5.

The district court then entered judgment jointly against the carriers—including One Way—for over $4.5 million. *Cagle I*, Dkts. 142 at 43; 143.

### B.    One Way's Two Insurers Provide Surety Obligations

As we will explain, for this case's purposes, the regulatory scheme provides for three document types: an insurance *policy*, the MCS-90 *endorsement*, and a *certificate* of insurance, which the insurer files with the FMSCA.

When the wreck occurred in July 2019, One Way was covered under *policies* issued by both National Indemnity and Old Republic (who is no

---

[4] Wesco was dismissed after prevailing on a Motion for Summary Judgment. National Indemnity makes much of this and another plaintiff's lawsuit against Wesco, which settled. *See* 11th Dkt. 30 at 24–26. But as we will explain in our Argument, other than for National Indemnity's meritless judicial estoppel argument, those proceedings are irrelevant to this Appeal.

longer a party to this appeal). Neither policy covered the truck involved in the wreck. (The federal MCS-90 *endorsement*, as we will discuss, extends to all One Way's trucks, not just those listed in the policy.)

National Indemnity issued its *policy* with an MCS-90 *endorsement* to One Way in May 2019, well before the wreck. Dkts. 60-1, 60-3. It also filed the required *certificate* with the FMCSA to prove the existence of that policy with the endorsement. Dkt. 60-2. Prior to the wreck, National Indemnity did not terminate its policy, cancel its endorsement, or cancel its certificate. Dkt. 90-8 at 1. Months after the wreck, in November 2019, it terminated the policy and refunded the remaining premium. *See* Dkts. 47-1 ¶¶ 5–6, 47-5, 47-6.[5]

Old Republic began covering One Way beginning in June 2019 by virtue of its policy issued to a different company, Ryder, when One Way began leasing some of Ryder's trucks. Dkt. 97-17.

But Old Republic didn't issue an MCS-90 endorsement to One Way right away. Instead, it issued an MCS-90 endorsement in August 2019—a month *after* the wreck—but it backdated that endorsement to June 2019,

---

[5] Per the parties' agreement, Mr. Cagle redacted evidence of the confidential premium amounts. *See,* Dkt. 47-1 ¶ 6 n.1.

based on when One Way began leasing Ryder trucks. Dkts. 61-18; 61-19. At the same time, in August, it also filed a certificate with the FMCSA showing the policy with the endorsement attached backdated to June. Dkt. 102-11.

Ultimately, what led to Old Republic's decision to issue the endorsement and file the certificate doesn't matter for the Court's decision. But because National Indemnity supports its argument by citing evidence about that topic, we address that evidence too.

National Indemnity claims that it had concerns about the Ryder-leased vehicles, but that isn't established by the record. It states it "became aware… that One Way was utilizing vehicles that were not scheduled on its policy." 11th Dkt. 30 at 21. But the evidence cited, Dkts. 97-2 ¶28; 97-18, simply lists those vehicles. It doesn't prove that National Indemnity knew about them.

Beyond that, National Indemnity relies almost entirely on an email chain between Ryder employees, Dkt. 97-17, and claims that email shows that Old Republic's endorsement and certificate would "resolve National Indemnity's 'split fleet' concerns and permit One Way's existing National Indemnity policy to stay in effect." 11th Dkt. 30 at 22. For starters, that email is double-hearsay as to National Indemnity, *see* Dkt. 97-17 at 3–4. But even crediting that email's substance, it doesn't establish if National Indemnity

had "split fleet concerns" or whether National Indemnity wanted to, threatened to, or intended to cancel its policy, or under what circumstances.

National Indemnity's reliance on *another company's* emails on Appeal is especially dubious given that (as explained below) it could have—but chose not to—introduce its own evidence.

### C.    *Cagle II*: Judgment Against One Way's Insurers

In *Cagle II*, Mr. Cagle sued both Old Republic and National Indemnity, claiming they had to satisfy the $4.5 million judgment up to the limits in their respective MCS-90 endorsements: $1 million for Old Republic, and $750,000 for National Indemnity. Both denied they had any MCS-90 liability.

Relying on the MCS-90's terms and the judgment and findings from *Cagle I*, Mr. Cagle moved for summary judgment. Dkt. 47. He argued that the *Cagle I* judgment satisfied the requirements to trigger MCS-90 exposure.

The insurers contested that point. While the Motion was pending, Old Republic sought additional discovery to "explore the relationships between the Defendants in Default." Dkt. 71 at 4. Old Republic argued that additional facts might limit MCS-90 exposure. Over Mr. Cagle's opposition, the district court allowed the discovery, even as it acknowledged that the "previous default findings may… ultimately foreclose the legal arguments" that

discovery would cover. *Id.* at 5. The insurers took three depositions, but didn't depose the kingpin, Calzada.

Thereafter, Mr. Cagle renewed his Motion to incorporate newly-discovered facts, including deposition transcripts and an affidavit from Calzada. Dkt. 90. Both insurers also moved for summary judgment. Dkts. 96, 97. National Indemnity argued (and still contends) that its MCS-90 endorsement was replaced by Old Republic's, or, alternatively, wasn't triggered by the judgment against One Way.

The district court disagreed. It found that National Indemnity's endorsement remained in effect and was triggered by the judgment. It granted Mr. Cagle's Motion and denied National Indemnity's. *See* Dkt. 113. The district court also held (on reconsideration) that Mr. Cagle could recover under Old Republic's endorsement. *See* Dkt. 119.

### D.    National Indemnity's Appeal

Originally, both insurers appealed, and Mr. Cagle conditionally cross-appealed. But Old Republic dismissed its appeal, which also mooted Mr. Cagle's cross-appeal. Accordingly, this Court does not need to evaluate whether Mr. Cagle was entitled to recover under Old Republic's MCS-90.

Instead, the sole remaining appeal concerns only National Indemnity's

liability under its own MCS-90 endorsement. In its Brief, National Indemnity challenges four of the district court's holdings below.

### E.    Standard of Review

We agree that the Court reviews Issues 1–3 *de novo* and (as National Indemnity acknowledges in its Argument) Issue 4 for abuse of discretion.

## Summary of the Argument

For each substantive issue (1-3), we structure our arguments around the key texts—the endorsement itself and the governing regulations.

**1.** Per its plain terms, National Indemnity's MCS-90 remained in effect. Its insured, One Way, gave the consideration for that endorsement—the premium—for months after the wreck. National Indemnity didn't terminate its policy or cancel its endorsement before the wreck. The district court correctly held that meant its endorsement remained in effect.

Instead of relying on the MCS-90's text, National Indemnity argues that its endorsement was canceled pursuant to regulation. Conceding that its *policy* wasn't replaced or terminated, and that it never cancelled its *endorsement*, it argues that when Old Republic filed a replacement *certificate* of insurance, that filing automatically terminated its *endorsement*. (We emphasize these terms because the regulations distinguish them.)

But the regulations don't say that—and neither do the cases interpreting them. The provisions' plain language confirms what the MCS-90 itself says: that an insurer can terminate the endorsement *only* by cancelling it.

**2 & 3**. Because National Indemnity's MCS-90 remained in effect at the time of the wreck, the Court should also affirm the district court's correct holding that the judgment against One Way in *Cagle I* triggers National Indemnity's MCS-90 liability. In Issues 2 and 3, National Indemnity proposes limits that would prevent Mr. Cagle's recovery. But as we show, these proposed limits have no basis in any text.

For Issue 2, National Indemnity argues that MCS-90 liability arises *only* for *another carrier's* insurer, not for One Way. For Issue 3, National Indemnity argues that Mr. Cagle can't recover from its MCS-90 because he (or others) could possibly recover from *another insurer's* MCS-90. Both those limitations ignore the MCS-90's plain-text liability for "any final judgment recovered against the insured." And this Court's (albeit limited) binding caselaw further confirms the point. The district court correctly rejected both.

**4.** The district court did not abuse its discretion in rejecting judicial estoppel. The court correctly recognized that Mr. Cagle never took inconsistent positions that somehow misled him. This argument is a sideshow.

## Argument and Citations of Authority

Looking to the plain language of the governing MCS-90 and applicable regulations, the Court should affirm on all four issues.

The Court construes the MCS-90's terms "strictly against the insurer" and broadly in favor of "motor carrier insurance coverage" under the endorsement. *Miller v. Harco Nat'l Ins. Co.*, 241 F.3d 1331, 1334 (11th Cir. 2001). And it "construe[s] regulations in much the same way we interpret statutes, so we start with the text—and, if we find it clear, we end there as well." *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818 (11th Cir. 2020).

Because the endorsement's text matters first and foremost, we recite and explain its terms below before turning to the issues on appeal.

**\*    The MCS-90 Endorsement**

Often, when a plaintiff sues the defendant and obtains a judgment, he can't recover unless the defendant is covered by insurance. So if the insurer denies coverage to the *defendant*, the *plaintiff* could be left without a remedy.

When trucking companies are involved (and the injury risk greater), MCS-90 endorsements work to prevent that unfair result and protect the public. "[T]he primary purpose of the MCS–90 is to assure that injured members of the public are able to obtain judgment from negligent authorized

Page 11 of 60

interstate carriers." *Aequicap Ins. Co. v. Canal Ins. Co.*, 303 Ga. App. 508, 512, (2010), *case cited in Progressive Mountain Ins. Co. v. Madd Transp., LLC*, 633 F. App'x 744, 746 (11th Cir. 2015). Thus, while insurance policies protect the *defendant*, the attached MCS-90 endorsements protect the *plaintiff*.

To that end, the MCS-90 "amend[s]" the insurance policy to which it "is attached" to add the following terms:

> In consideration of the premium stated in the policy to which this endorsement is attached, *the insurer (the company) agrees to pay*, within the limits of liability described herein, *any final judgment recovered against the insured* for public liability resulting from *negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements* of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy....
>
> The *insured agrees to reimburse the company…* for any payment that the company would not have been obligated to make under the provisions of the policy....
>
> [U]pon failure of the company to pay any final judgment recovered against the insured as provided herein, *the judgment creditor may maintain an action* in any court of competent jurisdiction *against the company* to compel such payment.

Dkt. 60-3 at 3 (emphasis added).[6]

In other words, once a plaintiff has a judgment against an applicable

---

[6] We cite National Indemnity's MCS-90, but the form's terms are the same. *See* 49 C.F.R. § 387.15 (citing http://www.fmcsa.dot.gov/mission/forms).

carrier, the MCS-90 provides its protection via (essentially) three steps:

(1) It subjects the *insurer* to direct liability to the judgment-creditor plaintiff up to the amount listed in the endorsement;

(2) It provides that the insurer's liability to the plaintiff arises *regardless of whether the driver or truck are covered by the policy*;

(3) It then allows the insurers to recover *from the defendant insured* any of that payment liability not covered by the policy (*e.g.*, if the truck wasn't a covered vehicle).

In this Court's words, "The MCS–90 provides a broad guaranty that the insurer will pay certain judgments incurred by the insured regardless of whether the motor vehicle involved is specifically described in the policy or whether the loss was otherwise excluded by the terms of the policy." *Miller*, 241 F.3d at 1333. Because of the final step—reimbursement—courts often refer to the endorsement as a "suretyship" rather than an ordinary "insurance contract." *See, e.g., Canal Ins. Co. v. Coleman*, 625 F.3d 244, 247 (5th Cir. 2010).

In effect, the MCS-90 merely shifts responsibility for collecting a judgment from the plaintiff to the insurer. It neither results in a windfall for the plaintiff (because it requires the plaintiff suffer injuries and obtain a judgment), nor creates additional liability (because the insurer can recover from its insured). To the extent the insurer faces risk of non-payment "as a practical matter," as Amicus APCIA suggests, 11th Dkt. 39 at 13, that only reaffirms

the point. The insurer can (and presumably does) incorporate that risk into that insured's premiums. The plaintiff has no such recourse.

With that text in mind, we turn to the issues on appeal.

## 1. National Indemnity's MCS-90 remained in effect.

National Indemnity argues first that the district court erred in holding that its MCS-90 remained in effect when the wreck occurred because, it says, its endorsement was replaced by Old Republic's. That argument fails, and this Court should affirm, for any of several reasons.

### A. National Indemnity abandoned this issue by failing to challenge the district court's second ground for its holding.

The district court rejected National Indemnity's replacement argument on *two* independent grounds. *First*, it concluded that the new insurer, Old Republic, "did not follow the prescribed replacement procedure" and so did not in fact replace National Indemnity's endorsement. Dkt. 113 at 40. *Second*, it found that, because National Indemnity collected the full premium—*i.e.*, for *both* policy and endorsement—until well after the wreck, it continued to be "compensated by One Way to serve as surety," which proved its endorsement had not been terminated but remained in effect. *Id.* at 41.

Though it challenges the former, *National Indemnity does not*

*challenge the second ground* on Appeal.

That is reason enough to affirm as to Issue 1. "[W]hen an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground." *Anthony v. Georgia*, 69 F.4th 796, 807 (11th Cir. 2023) (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014)).

That rule applies on an issue-by-issue basis. *Id.* If the unchallenged ground suffices to support the judgment—as here just as in *Anthony*—failing to contest that ground means the Court can "affirm as to this issue." *Id.* at 808. Accordingly, this Court should affirm as to Issue 1 on that basis alone.

## B.     By its text, National Indemnity's MCS-90 remained in effect.

Beyond being uncontested, the district court got it right when it held that National Indemnity's decision not to cancel the endorsement and instead to collect the full premium meant that its "MCS-90 endorsement" was "still in effect on the date of the Accident." Dkt. 113 at 41.

To see why, look to the text—the MCS-90's terms concerning (1) the premium as consideration and (2) cancellation. As noted above, this Court must construe these terms "strictly against the insurer" and broadly in favor of "motor carrier insurance coverage" under the endorsement. *Miller*, 241

F.3d at 1334. That mandate contradicts Amicus APCIA's unsupported suggestion that the Court should "presum[e] that the MCS-90 endorsement's scope is limited." 11th Dkt. 39 at 14.

**Premium/Consideration**. Per the endorsement, National Indemnity provided its MCS-90 obligations "[i]n consideration of the premium stated in the policy to which this endorsement is attached[.]" Dkt. 60-3 at 3. By paying that premium, One Way purchased National Indemnity's surety obligations *in addition to* the ordinary policy protections. As one court explained, "even though the MCS-90 endorsement is included in interstate motor carriers' policies, [] those carriers *pay additional fees to assure compliance* with federal minimum levels of financial responsibility for motor carriers[.]" *Progressive Hawaii Ins. Corp. v. D&N Transp., Inc.*, No. 4:20-CV-02726, 2022 WL 18396217, at *6 (S.D. Tex. Dec. 1, 2022) (emphasis added).

National Indemnity contends that the district court's holding means that it could be liable for vehicles "for which it received no premium[.]" 11th Dkt. 30 at 22 n.1. That gets it backwards. By definition, by attaching the endorsement, National Indemnity collected a premium for more than covering *solely* the vehicles identified in its policy. And, as noted above, the endorsement plainly dictates that those surety obligations applied "regardless of

whether" One Way operated additional trucks. Dkt. 60-3 at 3.

**Cancellation**. The text also states how to cancel the MCS-90:

Cancellation of this endorsement may be effected by the insurer or the insured motor carrier (1) by giving thirty-five (35) days' notice in writing to the other(35 days' notice shall commence to run from the date the notice is transmitted proof of transmission shall be sufficient proof of notice), and (2) if the insured motor carrier is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, DC).

Dkt. 60-3 at 2. Again, National Indemnity undisputedly did not cancel its endorsement via these steps. Dkt. 90-8 at 1.

Amicus APCIA effectively illustrates how these two provisions work together (despite arguing National Indemnity's position) when it notes that a "*cancelled insurer* is, most often, *no longer receiving premium payments* from the motor carrier *connected to the endorsement*." 11th Dkt. 39 at 19 (emphasis added). But here, National Indemnity did not cancel. Instead, it collected the full premium. Because it kept profiting from the promise of its surety obligations, its argument that those obligations ceased necessarily fails.

### C.    Per the regulations, Old Republic' "certificate" didn't terminate National Indemnity's "endorsement."

Ignoring those terms, National Indemnity instead argues that its MCS-

90 was terminated under a procedure purportedly provided by regulation.

As we will show, the pertinent regulations distinguish three document types: the insurance *policy*, the *endorsement* (form MCS-90), and the *certificate* of insurance (form BMC-91X).[7]

Conceding that its *policy* wasn't replaced or terminated and that it never cancelled its *endorsement*, *see* Dkt. 113 at 38, National Indemnity argues that when Old Republic filed its *certificate*, that filing automatically terminated National Indemnity's MCS-90 *endorsement*. That is incorrect.

Here again, "we start with the text." *Young*, 980 F.3d at 818.  National Indemnity primarily cites 49 C.F.R. **§ 387.7** and **§ 387.313T**.[8] *See* 11th Dkt. 30 at 23, 23 n.7. Though mainly focused on the latter, it claims in passing in a footnote that the two provisions are "similar." *Id.* That perfunctory description doesn't capture either their material differences or how those provisions apply to the specific issue here. Each has two pertinent subsections. We address those below along with a third pertinent provision.

---

[7] The regulations also discuss "surety bonds," which provide an alternative method of meeting the requirements, but those aren't at issue here.

[8] Although the District Court cited 49 C.F.R. § 387.313, National Indemnity primarily cites § 387.313T. Because these provisions appear to be materially identical, we follow National Indemnity in citing the latter.

**Section 387.7 ("Financial Responsibility Required").** Start with § 387.7's provision on termination, subsection **(b)(1)**:

> (b)(1) *Policies of insurance*, surety bonds, and ***endorsements*** required under this section shall remain in effect continuously until *terminated*. *Cancellation* may be effected by the insurer or the insured motor carrier giving 35 days' notice in writing to the other. The 35 days' notice shall commence to run from the date the notice is transmitted. Proof of transmission shall be sufficient proof of notice.

(emphasis added). Plainly, (b)(1) applies to both "[p]olicies of insurance" and "endorsements." The provision distinguishes two acts: *cancellation* (*i.e.*, giving notice) and *termination*. Its meaning is clear: before an insurer terminates a policy or endorsement, it must cancel by giving notice.

Section 387.7 **subsection (c)** discusses replacement, rather than cancellation. It is materially different than (b)(1):

> (c) *Policies of insurance* and surety bonds required under this section may be *replaced* by other *policies of insurance* or surety bonds. The liability of the retiring insurer or surety, as to events after the termination date, shall be considered as having terminated on the effective date of the replacement policy of insurance or surety bond or at the end of the 35 day cancellation period required in paragraph (b) of this section, whichever is sooner.

(emphasis added). In particular, and in contrast to subsection (b)(1), subsection (c) does not discuss "endorsements." It only discusses "policies[.]"

That deliberate omission indicates that ***endorsements cannot be***

Page 19 of 60

*terminated by replacement*—at least not separate from the policies to which they are attached. If the FMCSA wanted to allow termination of endorsements by replacement, it could have written "endorsements" into the text of subsection (c), just as in subsection (b)(1). It didn't.

Even for insurance policies, subsection (c) doesn't conflate replacement with termination. We know replacement can't mean the same thing as termination because the provision provides that the liability of the "retiring [*i.e.*, replaced] insurer" is limited only for "events *after the termination date*." *Id.* (emphasis added). The reference to "termination date" must mean something other than the date when the "liability… [is] considered as having terminated"—otherwise including that language wouldn't make sense. *Id.* To illustrate, consider a carrier that had an old policy through October 15, but obtained a new policy effective October 1. Despite the overlap, the old insurer would be liable through "the termination date"—*i.e.*, October 15.

Rather than terminating the old policy, obtaining a *replacement* policy eliminates the 35-day *cancellation* notice requirement from (b)(1). Assuming the policy otherwise terminates, the outgoing (or "retiring") insurer has no liability for the ordinary 35-day *cancellation* period that follows. Given the goal of ensuring continued coverage, that makes sense—the notice isn't

needed under those circumstances. (But again, National Indemnity concedes that its *policy* wasn't terminated or replaced.)

**Section 387.313T ("Forms and Procedures")**. National Indemnity primarily points to Section 387.313T. But that provision ***doesn't address termination of endorsements at all***—it addresses only "certificates of insurance."

Like § 387.7, § 387.313T includes two pertinent subsections. Its **subsection (d)** provides for "[c]ancellation notice":

> (d) Cancellation notice. Except as provided in paragraph (e) of this section, surety bonds, *certificates of insurance*, and other securities or agreements shall not be *cancelled* or withdrawn until 30 days after written notice has been submitted to http://www.fmcsa.dot.gov on the prescribed form (Form BMC–35, Notice of Cancellation Motor Carrier Policies of Insurance under 49 U.S.C. 13906, and BMC–36, Notice of Cancellation Motor Carrier and Broker Surety Bonds, as appropriate) by the insurance company, surety or sureties, motor carrier, broker or other party thereto, as the case may be, which period of thirty (30) days shall commence to run from the date such notice on the prescribed form is filed with FMCSA.

(emphasis added). No mention of "endorsements"—only "certificates."

So too its **subsection (e)**, which discusses replacement:

> (e) Termination by replacement. *Certificates of insurance* or surety bonds which have been accepted by the FMCSA under these rules may be *replaced* by other certificates of insurance, surety bonds or other security, and the liability of the retiring insurer or surety *under such certificates of insurance* or surety bonds shall be considered as having terminated as of the effective date of the

replacement certificate of insurance, surety bond or other security, provided the said replacement certificate, bond or other security is acceptable to the FMCSA under the rules and regulations in this part.

(emphasis added). Again, it nowhere mentions "endorsements."

**Section 387.15 ("Forms")**. Though National Indemnity doesn't mention it, a third provision also confirms that § 387.7, not § 387.313T, governs the termination of endorsements. Section 387.15 states as follows:

> *Endorsements for policies of insurance (Form MCS–90)* and surety bonds (Form MCS–82) must be in the form prescribed by the FMCSA and approved by the OMB. Endorsements to policies of insurance and surety bonds shall specify that coverage thereunder will remain in effect continuously until terminated, *as required in § 387.7 of this subpart*.

(emphasis added). That provision makes no mention of § 387.313T.

Taken together, these provisions' plain language permits only one interpretation reflecting two key points. *First*, § 387.7 (not § 387.313T) governs termination of endorsements. *Second,* to terminate the endorsement, the insurer must cancel it—it cannot merely replace it. *See* § 387.7(b)(1).

That interpretation aligns with the MCS-90's text, which, as explained above provides how "[c]ancellation of this endorsement may be effected[.]"Dkt. 60-3 at 2. It says nothing about *replacing* the endorsement.

National Indemnity asks this Court to rewrite those provisions to

allow its preferred outcome. Amicus Canal Insurance—parroting that view—claims that § 387.313T "include[s] procedures for an insurer to cancel *its MCS-90 endorsement and* certificate of insurance". 11th Dkt. 42 at 12 (emphasis added). The insurers may wish the provision said that, but it doesn't. And because National Indemnity didn't cancel the endorsement, per the regulations, it remained in effect.

### D.    Caselaw confirms the regulations' plain meaning.

Also contrary to what National Indemnity and the Amici suggest, the (admittedly limited) caselaw on this issue—including the only binding case from this Circuit and the only case cited by National Indemnity on this issue—confirms this text-based interpretation.

This Court upheld a similar conclusion on similar facts in *Empire Fire & Marine Insurance Co. v. J. Transport, Inc.*, 880 F.2d 1291, 1292 (11th Cir. 1989). There, in reviewing a different court's judgment for its preclusive effect, the Court considered the liability rules when two policies with endorsements remained in effect because the insured "had paid for and was insured under two separate policies of insurance" and didn't terminate the former policy or endorsement before the wreck. *Id.*

When the later insurer refused to defend, the former insurer defended

Page 23 of 60

but also cross-claimed, seeking a declaratory judgment that the later insurer "should assume full responsibility for the defense." *Id.* The trial court issued a declaratory judgment finding *both* companies liable. *Id.* That meant the former insured was liable *to the plaintiff* under its endorsement even though a second insurer had also provided an MCS-90 endorsement to the insured. The plaintiff settled the underlying suit, and the insurers each paid a portion the settlement to the plaintiff. *Id.*

Next, the former insurer sued its insured in this Circuit for reimbursement under the MCS-90. This Court addressed whether the court's judgment in the underlying case precluded that reimbursement. The Court found that the first court's declaration was res judicata as to "coverage pursuant to the endorsement" with respect to the plaintiff *Id.* That was because that court "*necessarily determined that [the former's] insurance policy was still in effect at the time of the accident.*" *Id.* at 1298 (emphasis added). In other words, because the policy remained in effect, the MCS-90 also remained in effect. *Id.* (The Court then concluded that the underlying court had not addressed whether the truck was covered by the *policy*, so the litigation could go forward on that reimbursement-specific question. *Id.* at 1298.)

*Empire Fire* illustrates how the regulations outlined above bear on this

Page 24 of 60

case's facts: even though the later insurer (Old Republic) issued its own endorsement, because National Indemnity did not terminate its policy or endorsement, the MCS-90 remained in effect. So it is liable to Mr. Cagle, but it retains its right to seek reimbursement from its insured as to that liability.

Next, consider *Northland*—National Indemnity's sole case on this issue. *See Northland Ins. Co. v. New Hampshire Ins. Co.*, 63 F. Supp. 2d 128 (D.N.H. 1999). National Indemnity emphasizes *Northland's* statement that "'an MCS-90 endorsement also will be cancelled *automatically* notwithstanding the insurer's failure to comply with the endorsement's cancellation requirements if the policy holder purchases 'replacement' insurance.'" 11th Dkt. 30 at 41 (quoting and emphasizing *Northland*, 63 F. Supp 2d at 134).[9] It claims Northland allows for termination of an *endorsement* via a replacement *certificate*. That is wrong. Even that quoted sentence refers to "replacement *insurance*," *id.* (emphasis added), which indicates that *Northland* doesn't address terminating an endorsement by replacing a *certificate*.

---

[9] In its explanation, the *Northland* court conflated *cancellation* and *termination*. But that was an understandable oversight—as we will explain, that distinction didn't matter to the *Northland* court because it had already determined that the policy had been terminated before the wreck.

Instead, *Northland* answers a different question based on a key and different fact. There, unlike here, the former insurer ***cancelled its policy (with the attached endorsement) before the wreck*** because the insured "did not make the required premium payment by the August 31 [] deadline[.]" 63 F. Supp 2d at 131. So both policy and endorsement terminated on August 31.

Several weeks later, the insured obtained new insurance from a second insurer, which "provided coverage retroactively from September 1[.]" *Id.*

But before the new policy was enacted, the wreck occurred on September 21. *Id.* The new policy didn't cover the wrecked truck because the insured no longer intended to operate it and because the insured (incorrectly) believed it was covered by a 30-day grace period under the old policy. *Id.*

Here's the rub: the newer insurer did not file its BMC-91X *certificate* reflecting its new, backdated policy until after the wreck. *Id.* at 131, 134 n.5. *Id.* The court doesn't say so expressly, but the implication is that the former *certificate* therefore remained on file up through the time of the wreck.[10]

---

[10] So too in all the other cases cited for this point by Amicus Canal Insurance. *See* 11th Dkt. 42 at 14–15 (citing *Northland* and additional cases):

- In *Lancer Ins. Co. v. Rockmore*, No. 3-04-CV-0022-K, 2005 WL 8158370, at *1 (N.D. Tex. Oct. 14, 2005), the policy was "canceled effective November 25, 2001 for non-payment of premium." Thereafter, the

That gave rise to *Northland*'s question: whether the former insured was liable under the outgoing *certificate*, even though the *policy* (with the endorsement) had terminated. That is a different question from here.

That question is also easily answered by the regulations' text. Properly understood, *Northland* presents the exact scenario that § 387.313T(e) covers: "the liability of the retiring insurer or surety *under such certificates of insurance or surety bonds shall be considered as having terminated* as of *the effective date of the replacement certificate of insurance*." (emphasis added).

Because the *policy* had been terminated, the only possible basis for the former insurer's liability after September 1 was the *certificate*. But in fact, that certificate had been replaced: though the new certificate was filed after the wreck, it reflected the effective date of the backdated policy: September 1.

---

insured "obtained replacement insurance" from another company, "effective December 4, 2021." *Id.* And the accident occurred "June 24, 2002." *Id.* at *2.

- And in *Am. Auto. Ins. Co. v. Transp. Ins. Co.*, No. 03-72989, 2005 WL 8165556, at *2 (E.D. Mich. Feb. 15, 2005), the "insurance policy, on its face, expired in 1998" and "[a]fter October of 1998 and through the date of the accident," the trucking company had insurance through another company.

These cases involve the separate question of possible liability under the ongoing *certificate* when the *policy* was terminated.

*Northland*, 63 F. Supp. 2d at 131. So the new insurer wasn't liable to the plaintiff under the *certificate* either. *Id.* at 135.

*Northland* correctly answers the question before that court. And its analysis reaffirms the regulations' plain meaning. If National Indemnity had terminated its *policy* effective before the wreck, *Northland* might apply here. But on the actual facts of this case, it doesn't apply.

Instead, *Northland* reaffirms the meaning of the regulations (and other caselaw) above—that National Indemnity's decision not to terminate its policy or cancel its endorsement but instead to collect the premium for both dooms its contention that its MCS-90 wasn't in effect.

Accordingly, the Court should affirm as to Issue 1.

2.    **The *Cagle I* judgment against One Way triggered National Indemnity's MCS-90 liability.**

Assuming National Indemnity's MCS-90 remained in effect, for Issues 2 and 3,[11] National Indemnity proposes limitations that nonetheless purport

---

[11] Beyond inconsistency between the Statement of Issues and Argument (as we noted in our Statement), National Indemnity's arguments and headings overlap for its Sections II and III, and it isn't entirely clear what point it is making when citing cases across those two sections. While we acknowledge that these issues are related—indeed we think the plain text resolves them both equally—we organize these sections as stated in our Statement.

to prevent Mr. Cagle from recovering under it. For Issue 2, National Indemnity argues that MCS-90 liability arises only for the negligence of another involved carrier (First Time), not its insured (One Way). But that limitation defies the text (and the regulatory purpose). Applying the text, this Court should affirm the district court's holding that the judgment against One Way in *Cagle I* triggers National Indemnity's MCS-90 liability.

### A.    The MCS-90's text sets the requirements for liability.

Below, even before ruling on summary judgment, the district court grappled with different viewpoints of how to trigger MCS-90 exposure.

*First*, as noted above, Mr. Cagle argued that—per the MCS-90's terms—liability flowed *directly* from the judgment against One Way. As we will show, that is the proper framework for this Court's analysis.

*Second*, by contrast, National Indemnity argued (and still contends) that its MCS-90 wasn't triggered because One Way wasn't "*the* [singular] motor carrier of record at the time of the loss." 11th Dkt. 30 at 48 (emphasis added). Elsewhere, it frames that issue in terms of "authority" by asking "which entity's *authority* the load was being hauled under at the time of the [u]nderlying [l]oss." *Id.* at 45. (By our count, it mentions "authority" in this sense some 44 times and "*the* motor carrier of record" (emphasis added)

another 15 times.) National Indemnity's apparent logic is that only one car-rier's liability can trigger MCS-90 exposure, and it argues based on the facts that only First Time, not One Way, triggered such exposure.

*Third*, in its discovery and summary judgment orders, the district court outlined a sort of middle ground derived from various non-binding cases. The court analyzed whether "One Way was operating as *a* 'For-Hire Motor Carrier'" when the wreck occurred. Dkt. 113 at 29 *et seq.* (emphasis added). In other words, FHMC status wasn't exclusive, and more than one carrier could trigger MCS-90 exposure for their insurers.

For this framework, the district court relied primarily on this Court's unpublished opinion from *National Specialty Insurance Co. v. Martin-Vegue*, 644 F. App'x 900, 907 (11th Cir. 2016) ("Federal regulations define a for-hire motor carrier as a carrier in 'the business of transporting, for compensation, the goods or property of another.'") (quoting 49 C.F.R. § 387.5), and the Tenth Circuit's unpublished opinion in *Herrod v. Wilshire Insurance Co.*, 499 F. App'x 753, 757 (10th Cir. 2012). Dkt. 71 at 4–5, 4 n.3.

Applying those cases, the district court correctly rejected National In-demnity's single-carrier "authority" framework when it stated that "operat-ing under the 'authority' of [a for-hire-motor-carrier] is not a defining

element of the MCS-90 endorsement analysis." Dkt. 113 at 36. National Indemnity calls that ruling "inexplicabl[e]." 11th Dkt. 30 at 29. We call it a text-based ruling that applies the law. The terms "authority" or "*the* motor carrier of record" (emphasis added) appear *nowhere* in the MCS-90.

The district court instead concluded that, applying either Mr. Cagle's judgment-based framework *or* the other courts' "for-hire-motor-carrier" framework, National Indemnity's MCS-90 was triggered. As to the latter, the district court concluded that "undisputed evidence in the case supports the finding that One Way has FHMC status with respect to [the] Accident." Dkt. 113 at 37. Then, as an alternative ground, the district court concluded that "[e]ven if an issue of fact existed" as to "FHMC status," National Indemnity would still have exposure because "both First Time and One Way are jointly and severally liable for the Final Judgment" in *Cagle I. Id.* at 37–38.

As we show below, under either—*i.e.*, whether this Court analyzes One Way as a for-hire motor carrier or as a judgment-debtor—the facts and proceedings undisputedly show that the judgment against One Way triggers the MCS-90's exposure. But, despite the persuasive authority noted above, this latter alternative holding hews closest to the text. Per the MCS-90's terms, National Indemnity agreed to pay "*any final judgment* recovered

against [One Way]…." Dkt. 60-3 at 3. That is the textual basis for liability.

Binding caselaw supports applying the plain-text approach. This Court—via the Georgia Supreme Court—concluded that the "mere fact *that a court held the insured liable* for an act covered by his policy [via the MCS-90] create[s] liability for the insurer." *Miller v. Harco Nat'l Ins. Co.*, 280 F.3d 1353, 1355 (11th Cir. 2002), *adopting certified answers,* 274 Ga. 387 (2001), *answering certified questions,* 241 F.3d 1331 (emphasis added). (Per the brackets added, though the Court referred to the "policy," the initial *Miller* opinion makes clear the Court was assessing MCS-90 liability. *See* 241 F.3d at 1334.)

Courts in other circuits agree. *See, e.g., Carolina Cas. Ins. Co. v. E.C. Trucking*, 396 F.3d 837, 841 (7th Cir. 2005) ("[T]he endorsement is particularly applicable, as a jury rendered a final judgment against [the] insured, for liability arising from the negligent injury of a member of the public[.]"); *Fairmont Specialty Ins. Co. v. 1039012 Ontario, Inc.*, No. 2:10 CV 070, 2011 WL 3651333, at *7 (N.D. Ind. Aug. 19, 2011) ("a default judgment is a final judgment that triggers an insurer's liability under an MCS–90").

Holding to the MCS-90's "judgment" requirement also puts to rest Amicis' doom-and-gloom warnings about the district court's order upending the industry. For example, Amicus APCIA states that the District Court's

holding means that "a motor carrier may be held liable, and an MCS-90 endorsement may be triggered, simply because the motor carrier has an arrangement with the driver of the vehicle, even if that arrangement is not relevant to the shipment being hauled at the time of the accident." 11th Dkt. 39 at 16–17. That ignores the judgment requirement.

The judge or jury in the underlying case determines the carrier's involvement and liability, and the judgment conclusively confirms both. As we will show below, once that judgment is final, the MCS-90 itself outlines the prerequisites for when an insurer's liability is triggered.

### B.    Under the plain-text, the *Cagle I* judgment satisfies the MCS-90's requirements.

**Text-based framework.** Under the MCS-90, National Indemnity agreed to pay "any final judgment recovered against [One Way] for public liability resulting from *negligence in the operation, maintenance or use* of motor vehicles *subject to the financial responsibility requirements* of Sections 29 and 30 of the Motor Carrier Act." Dkt. 60-3 at 3 (emphasis added).

Thus, this Court asks two questions: *first*, was the judgment against One Way for its "negligence in the operation, maintenance or use of" the truck? And *second*, was that truck "subject to the financial responsibility

requirements of Sections 29 and 30 of the Motor Carrier Act"? The first question needs no elaboration.

As to the second, the Fifth Circuit explained that whether a truck is "subject to the Motor Carrier Act's financial responsibility requirements" depends on whether it was engaged in the "transportation of property" in interstate commerce when the wreck happened. *Coleman*, 625 F.3d at 248–49, 253) (analyzing 49 U.S.C. § 31139(b), which codified the MCA sections).

**Application.** Here, the answer to both questions is yes. That was *Cagle I*. As for the *first* question, the district court's findings confirm that the judgment against One Way (the insured) was for its negligence. The Court then held that "The Defendants in Default [including One Way] are liable to Plaintiff on Plaintiff's claims for negligent hiring, training, entrustment, retention and maintenance, vicarious liability for the negligence of Defendant Loyola, and for attorney's fees and punitive damages." Dkt. 47-10 at 6. National Indemnity doesn't appear to challenge that.

As for the *second* question, the district court's findings also confirm that One Way's wrecked truck was "subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act" because it was carrying property in interstate commerce. *See Coleman*, 625 F.3d at 248–49.

Page 34 of 60

For starters, Mr. Cagle alleged that One Way was "subject to the [Federal Motor Carrier Safety Regulations] on July 16, 2019, and at all relevant times prior to that date," Dkt. 58-6 ¶ 150, and the district court found first that the Complaint's allegations "are taken as true." Dkt. 47-10 at 5. But more to the point, the district court also made specific findings about the wreck:

- "On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default [including One Way] were engaged in interstate commerce as a motor carrier." *Id.* at 17.

- "On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default [including One Way] were engaged in carrying property in interstate commerce." *Id.*

- "On July 16, 2019, the day of Plaintiff's wreck, all Defendants in Default [including One Way] were operating a commercial motor vehicle." *Id.*

Those findings exactly track the requirements imposed by the statute and, in turn, the endorsement. (Contrast that to *Coleman*, where parties stipulated that the truck wasn't carrying property at the time. *See* 625 F.3d at 249.)

National indemnity does not and cannot contest those findings. Thus, *Cagle I* conclusively demonstrates that One Way was subject to judgment for its "negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 40 of the Motor Carrier Act." That is all the MCS-90 requires.

**C.**    **Though unnecessary, additional evidence from *Cagle II* further confirms that the judgment triggers the MCS-90.**

In addition to ruling based on joint liability, the district court correctly concluded that, under the "for-hire motor-carrier" framework outlined in various non-binding opinions, the "undisputed evidence in the case supports the finding that One Way has FHMC status with respect to [the] Accident." Dkt. 113 at 37. Though unnecessary, that holding was correct.

**FHMC-status framework**. This Court's unpublished decision in *Martin-Vegue*, 644 F. App'x 900, epitomizes this framework. There—different from here—the plaintiff had sued *only one defendant motor carrier* along with the driver of the vehicle. The plaintiff settled with company and driver, but the settlement with the driver left open the plaintiff's right to seek additional insurance coverage for the driver's liability. *Id.* at 902. Another affiliated carrier's insurer filed a declaratory judgment action seeking to confirm it owed no such liability. *Id.*

The Court framed the question this way: "[T]o decide if [the other insurer's] MCS-90 endorsement could possibly apply here, the relevant question is whether Freight [the other carrier] was *the* for-hire motor carrier… at the time of the accident." *Id.* at 907 (emphasis added). National Indemnity

picks up on the "the" in that quote to support its single-carrier authority framework. But that misreads the case.

The Court's decision never assumed that only one carrier could be "the" motor carrier—in fact, another carrier had already settled. This the Court was asking the question only of the second carrier. Its use of "the" was specific to that scenario. Nor did the Court's decision turn solely on whether that carrier had "authority." Instead, it looked to numerous facts—authority, the driver's employment status, who signed the bills, etc. *Id.* at 907.

From all that evidence—or lack thereof— the Court concluded that "there is thus no colorable evidence" that the other carrier was involved in the wreck. *Id.* It agreed with the district court that, based on the case's facts, only one of those defendants—the carrier that the plaintiff had sued—was operating the vehicle at the time of the wreck. *Id.* at 906–08. So the non-involved carrier's insurer had no MCS-90 exposure. That is the same sort of fact-based inquiry district court engaged in here, but, as we explain below, the facts here lead to the opposite conclusion about One Way.

At any rate, for the reasons in the section above, it isn't clear that the *Martin-Vegue* panel framed the question correctly in the first instance. Under the MCS-90's plain text, the Court could have (and perhaps should have)

Page 37 of 60

reached the same conclusion on simpler grounds: there was no *judgment* against the insured. (And the Court otherwise determined that the driver wasn't an insured under the company's policy.) Indeed, far from a judgment, that company *had never even been sued*. Per the MCS-90's terms, without a judgment, nothing triggered the MCS-90.

**Application.** Of course, *Martin-Vegue* doesn't bind this Court, so it doesn't mandate applying this framework. But even doing so, as the district court did in the alternative, the evidence unquestionably supports the conclusion that One Way was a for-hire motor carrier with respect to the wreck.

As explained in Section 2.B, above, the record from *Cagle I* conclusively establishes its facts, which support One Way's FMHC status.

Beyond that, the additional discovery from *Cagle II*—including three depositions and an affidavit—only further confirms that One Way was a "for-hire motor carrier" with respect to the wreck. To be sure, some of that evidence comes from the affidavit of Calzada, the kingpin of the numerous entities. But National Indemnity wrongly argues that the district court treated that one piece of additional evidence—the Calzada Affidavit—as "dispositive." 11th Dkt. 30 at 48. Even setting aside the district court's alternative holding, that misreads the Order.

The district court concluded that One Way had FMHC status based *in part* on *several* pieces of "undisputed evidence" from *Cagle II* that "support[] the finding that One Way has [For-Hire-Motor-Carrier] status with respect to the Accident." Dkt. 113 at 37. Those include "the Calzada Affidavit," which National Indemnity contests, but they also include "*additional evidence*," such as a lease agreement that proved that the truck "was under a lease… to One Way on the day of the Accident." *Id.* (emphasis added).

Indeed, Mr. Cagle extensively recited the evidence below in his statement of facts. *See* Dkt. 90-1. That evidence shows, among other things, that on the date of the wreck, the driver "was involved in a wreck while hauling a load for One Way and driving a 2014 Freightliner truck" and that One Way "was the for-hire motor carrier transporting property across state lines, using One Way's truck driven by Mr. Loyola" and that it "secured the load involved in the wreck." *Id.* ¶¶ 27, 30, 32. That suffices.

Thus, though the alternative holding was unnecessary, the district court was also correct that the evidence from both *Cagle I* and *Cagle II* demonstrates that One Way was operating as a for-hire motor-carrier with respect to the wreck. So under this framework, the judgment against One Way triggers National Indemnity's MCS-90 liability.

**D.    National Indemnity's "authority" limitation has no basis in the endorsement, regulations, caselaw, or policy.**

Finally, we address National Indemnity's proposed, alternative framework—based on the carrier's supposed "authority" and limited to one carrier per wreck. In this section, we show that framework has no basis in the text, regulations, or caselaw and that it contravenes the purpose underlying the FMCSA regulations. In the next, we show that, even if applied, it gives rise at most to a disputed question of fact for the jury.

**(Unsupported) authority framework – contrary text / regulations.** Even granting National Indemnity its most favorable reading of the MCS-90, such a limitation could only be grounded in the language limiting exposure to vehicles "subject to the *financial responsibility requirements* of Sections 29 and 30 of the Motor Carrier Act." *See* Form MCS-90, Dkt. 60-3 at 3 (emphasis added). But that doesn't help National Indemnity either.

To see why, follow the references. *See, e.g., Coleman*, 625 F.3d at 247 (tracing the MCS-90 requirements). The MCA provisions cited in the MCS-90 are implemented at 49 U.S.C. § 31139(b)(1). That statute directs the Secretary to promulgate "regulations to require minimum levels of *financial responsibility*." 49 U.S.C. § 31139(b)(1) (emphasis added). Those regulations, in

turn, are provided in C.F.R. Title 49, **Part 387**, which is titled, "Minimum Levels of *Financial Responsibility* for Motor Carriers," (emphasis added). That Part includes all the provisions discussed in Section 1, above. Unsurprisingly, those regulations—which expressly provide for the MCS-90—are the "*financial responsibility requirements*" to which the endorsement, via the statute, refers (emphasis added). So far, so good—that all tracks with the text-based framework we outlined above.

But National Indemnity derives its "authority" requirement from elsewhere—**Part 390**, which is titled "Federal Motor Carrier *Safety* Regulations" (emphasis added); *see* 11th Dkt. 30 at 46 (citing 49 C.F.R. § **390**.21 (describing logo marking requirements)). Under those separate regulations, trucks must bear the logo of a federally-authorized trucking company. And the logo-providing company can be "vicariously liable" for another's negligence solely because the truck involved "display[s] their USDOT certificate." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 724 (7th Cir. 2015).

Moreover, even under Part 390's separate scheme, the logo requirement expands, rather than limits, who can be liable: "Just because a plaintiff can quickly identify and sue the company whose placard appeared on the vehicle that struck him does not mean that the same plaintiff cannot sue—

and recover from—others who may also be at fault." *Id.*

So National Indemnity's attempt to read that separate safety requirement into the MCS-90 doubly fails: *first*, it contravenes the MCS-90's plain language pointing to the *financial responsibility* requirements, which are provided in Part 387—not Part 390. And *second*, it transmutes Part 390's liability-*expanding* provisions concerning logo liability regulations into liability-*restricting* limits in this separate context. That cannot be the law.

Even if there were some ambiguity in any of that language, this Court's admonition to construe it "strictly against the insurer" and broadly in favor of "motor carrier insurance coverage" would forbid National Indemnity's approach. *Miller*, 241 F.3d at 1334. But, to be clear, there is no ambiguity.

**(Unsupported) authority framework – contrary caselaw.** Unsurprisingly, the caselaw doesn't support National Indemnity's "authority" limitation either. National Indemnity does not cite a single case that supports their "authority"-based, single-carrier limitation. On the contrary, caselaw confirms that multiple carriers' liability can trigger MCS-90 endorsements.

In a binding decision[12] in *Carolina Casualty Insurance Co. v. Underwriters*

---

[12] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

*Insurance Co.*, 569 F.2d 304, 309 (5th Cir. 1978), the former Fifth Circuit ad-dressed a declaratory action between insurers as to liability for interrelated defendants operating a truck involved in a wreck. The truck was operating under the "certificate of authority" of a carrier covered by Underwriters. *Id. at* 309. Another carrier's insurer, Carolina—like National Indemnity here—sought to avoid its responsibility by pointing to Underwriters' MCS-90 obli-gations. *Id.* at 309–10. If National Indemnity's requirement were the rule, only Underwriters could be liable.

But that is not what happened. Instead, the Court affirmed the district court's holding that *both* insurers were liable, stating that "Carolina cannot disavow its primary insurer status on the theory that public policy demands that this be pushed off onto" the other insurer. *Id.* at 313.

Cases from other jurisdictions also allow for recoveries from multiple carriers' insurers under their respective MCS-90s. In particular, the Seventh Circuit's decision in *Carolina Casualty Insurance Co. v. E.C. Trucking*, 396 F.3d 837, 840–41 (7th Cir. 2005) involves logo-based carrier liability. But it doesn't advance "authority" as a limiting requirement for MCS-90 exposure.

There, the Seventh Circuit evaluated multiple insurers' liability for three carriers affiliated with a wrecked truck. Two carriers had settled,

Page 43 of 60

*including the one whose authority was used to haul the load. Id.* A third one had been held liable despite its authority not being used. *Id.* In the follow-up declaratory judgment action, the Seventh Circuit concluded that the judgment created MCS-90 exposure for the third carrier's insurer. That is because the "endorsement's language… plainly suggests that [the plaintiff] is entitled to recover" from the insurer based on "the final judgment against [its] insured." *Id.* at 841. That holding supports affirmance here.

National Indemnity misreads that case to mean that only that carrier's insurer could be liable under its MCS-90, but the Seventh Circuit never said that. Nothing about its ruling suggests that the other carriers' insurers could have escaped MCS-90 exposure had their insureds proceeded to judgment rather than settle. The Seventh Circuit didn't have any occasion to reach that question. *Id.* at 840. (However, the fact that the other carriers settled suggests that they — and presumably their insurers — contemplated their liability.)

Other cases further support the idea that multiple carriers' insurers can be liable. *See, e.g.*, *Fairmont*, No. 2:10 CV 070, 2011 WL 3651333, at *7 (when two carriers were liable, "Fairmont's MCS–90 endorsement has been triggered despite the existence and payment from National under its MCS–90 endorsement."); *Herrod*, 499 F. App'x at 757–58 ("Neither the text of the

USCA11 Case: 25-11778    Document: 53    Date Filed: 09/29/2025    Page: 57 of 75

statute nor that of the regulations indicates or implies that an MCS–90 insurer may avoid paying a negligence judgment against its insured on the basis that the injured party has received compensation from another motor carrier's insurer in settlement of claims against that carrier."); *Carolina Cas. Ins. Co. v. Cap. Trucking, Inc.*, 523 F. Supp. 3d 661, 677 (S.D.N.Y. 2021) (same, citing *Fairmont* and *Herrod*). These cases' outcomes would not be possible if National Indemnity's "authority" requirement were the law.

By contrast, the cases that National Indemnity cites for support in its Section II.A don't address this issue at all because they all involve a single trucking company defendant. *See* 11th Dkt. 30 at 43 (citing *Carolina Cas. Ins. Co. v. Est. of Karpov*, 559 F.3d 621 (7th Cir. 2009) (only one trucking company operating the wrecked truck); *Hamm v. Canal Ins. Co.*, 10 F. Supp. 2d 539, 541 (M.D.N.C. 1998) (same); *Auto-Owners Ins. Co. v. Munroe*, 614 F.3d 322, 323 (7th Cir. 2010) (three allegedly negligently operated trucks owned by one trucking company). Those cases address the different question of whether a *single* insurer must make *multiple* payments on behalf of a *single* insured. That is a different and irrelevant question.

**(Unsupported) authority framework – contrary policy.** To read an "authority" limitation into the MCS-90 as National Indemnity requests, this

Page 45 of 60

Court would not only have to ignore the text, statute, and regulations and misread the caselaw—it would also have to rule directly contrary to the policy underpinning the regulatory scheme.

One of the key purposes of the MCA was to "address abuses" related to "the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003). In other words, members of the public should not be left unable to recover simply because a motor carrier is playing shell games with which entity is technically operating the truck.

This case amply illustrates these all-too-common abuses. Indeed, National Indemnity acknowledges the District Court's findings that this "group of carriers," including One Way and First Time, were "chameleon carriers" owned by the same individual "who attempted to evade the requirements of the Federal Motor Carrier Safety Act." 11th Dkt. 30 at 60.

Yet even as it disavows these so-called "chameleon carriers," National Indemnity asks this Court to reward it for its own insured's chameleon carrier "shell games." 11th Dkt. 30 at 60. Indeed, it pushes that idea so far as to suggest that a *different insurer's* (Wesco's) voluntary settlement with a

*different plaintiff* in a *different case* against a *different carrier defendant* somehow prevents Mr. Cagle's recovery here. Nothing in the statute, governing regulations, the MCS-90's text, or the caselaw requires that absurd result.

> **E.    At most, there is a fact question about which entity's "authority" was being used at the time of the wreck.**

Finally, though this Court should not apply the "authority" framework, even if it did, a fact dispute would preclude summary judgment. Despite National Indemnity's position that First Time was the carrier with sole authority, all the evidence we cited above supports the conclusion that *One Way* was the entity whose authority was being used.

For example, Calzada averred that, when the wreck occurred, the driver was "hauling a load for One Way" and that "One Way was *the* for-hire motor carrier transporting property across state lines." Dkt. 90-2 ¶¶ 3, 6 (emphasis added). National Indemnity challenges Calzada's credibility, but determining witness credibility is "the ageless role of the jury"—*i.e.*, a fact question. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999).

Thus, if this Court applies the "authority" framework, at most, it should deny National Indemnity's Motion and remand for trial.

But to be clear, the Court shouldn't apply that framework. The Court

should apply the text-based framework. When it does (or if it applies the district court's alternative for-hire-motor-carrier framework), there is no dispute of material fact: One Way is liable, and so is National Indemnity.

Accordingly, the Court should affirm as to Issue 2.

**3.    Mr. Cagle can recover under National Indemnity's MCS-90 despite the possibility of other recovery.**

For similar reasons, the MCS-90's plain language resolves Issue 3 just as it did Issue 2. National Indemnity's Issue 3 resembles its Issue 2 in that both seek to limit MCS-90 exposure for reasons outside the MCS-90 itself. And while it doesn't always clearly delineate its arguments, for simplicity, we treat its Issue 3 as contesting the district court's holding that, assuming One Way's liability triggers National Indemnity's MCS-90 exposure, Mr. Cagle can recover under that MCS-90 despite the possibility of recovery under multiple MCS-90s for greater than the minimum limits.

National Indemnity sometimes refers to this conclusion as "multiplying" liability—either the number of MCS-90 endorsements or the federal minimum limits. *See* 11th Dkt. 30 at 45, 57. But as with Issue 2, that idea—and the associated limitation—has no basis in the text or regulations. And though some cases talk about similar limits in other contexts, those cases don't apply

Page 48 of 60

to the factual circumstances here. Instead, just like above, the *Cagle I* judgment suffices to trigger National Indemnity's MCS-90 exposure, full stop.

### A. The MCS-90 and regulations allow plaintiff to recover from multiple MCS-90s and for more the federal *minimums*.

**MCS-90.** Nothing in the MCS-90 itself supports a limitation on the *number* of distinct MCS-90s that can apply. The MCS-90 does contain a limitation—just not the one that National Indemnity suggests. It limits the payment to "the limits of liability *herein* described"—*i.e.*, not to the number of policies or any dollar amount contained in another policy. Dkt. 60-3 at 3 (emphasis added). Moreover, to limit the MCS-90's applicability for reasons beyond the four corners of that document based on the liable carrier's other available coverage or surety rights would violate the dictate that the MCS-90 applies "irrespective of the financial condition… of the insured." *Id.*

Again, the Court must construe these terms "strictly against the insurer" and broadly in favor of "motor carrier insurance coverage," *Miller*, 241 F.3d at 1334. The FMCSA could easily have written National Indemnity's proposed limitation into the MCS-90's terms. It didn't.

Simply put, once Mr. Cagle recovered a judgment against One Way, he could "maintain an action in any court of competent jurisdiction against

[National Indemnity] to compel such payment," so long as his judgment exceeded the endorsement's limits, as it does here. Dkt. 60-3 at 3.

**Regulations**. Likewise, National Indemnity points to no regulatory provision that either limits a carrier from obtaining multiple MCS-90s or limits a plaintiff from recovering under multiple MCS-90.

On the contrary, 49 C.F.R. § 387.7 (the same provision discussed in Section 1, above) specifically provides in subsection (d)(1) that a carrier may demonstrate "[p]roof of the required financial responsibility" by maintaining "Endorsement**(s)** for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980" (Form MCS–90) issued by an insurer**(s)**." (emphasis added). The key words—"endorsement(s)" and "insurer(s)" are written to be singular or plural. That plain language shows that multiple MCS-90s could apply.

Most obviously, the regulations permit an insurer to set its limit *lower* than the federal minimum, allowing *multiple insurers* can aggregate their coverage to satisfy the federal minimum. *See* 49 C.F.R. § 387.313T (a)(2)–(3). By definition, that means a plaintiff could recover under multiple MCS-90s.

But the regulations don't purport to cap recovery at the federal minimum amount either. National Indemnity contends that "[t]he goal of the

regulations, and of the MCS-90, is to ensure that in the event of a judgment against the named insured motor carrier, there is a reliable source of recovery for a plaintiff *in the amount of $750,000*, the minimum level of financial responsibility for most motor carriers." 11th Dkt. 30 at 17 (emphasis added). And the APCIA Amicus claims that "the public purpose of the MCS-90 endorsement [is] to provide minimum coverage *up to a fixed amount*[.]" 11th Dkt. 39 at 8 (emphasis added). But that isn't what "minimum" means.

The MCS-90 and the regulations' describe the "minimum levels of financial responsibility." 49 C.F.R. § 387.7(a). More accurately, the goal is to ensure "a reliable source of recovery for a plaintiff in the amount of" *at least* "$750,000." Indeed, Amicus Canal correctly acknowledges that these provisions require "*at least* $750,000." 11th Dkt. 42 at 10 (emphasis added).

The record further confirms this point. Here, Old Republic set its limit at $1 million, above the minimum. *See* Dkt. 97-20 at 2. That shows that an insurer *can* be subject to MCS-90 exposure above the minimums. The best National Indemnity can say about that is that Old Republic did so "[f]or reasons unknown to National Indemnity." 11th Dkt. 30 at 34 n. 5. (Presumably, the reason was to collect an increased premium for its higher limit—a bargain Old Republic was fully entitled to make.)

Taken together, if the endorsement and governing regulations contemplate both (1) recovery from multiple insurers and (2) recovery exceeding the *minimum* amount of $750,000, it follows that they permit recovery when both circumstances occur for the same wreck and judgment.

**B.    Caselaw confirms that plaintiffs can recover from multiple MCS-90s and more than the federal *minimums*.**

This Court's binding caselaw further confirms that a party can recover from multiple insurers (including under their MCS-90s).

Start with *Empire Fire*, 880 F.2d at 1291 *et seq.*, cited at Section 1.D., above. There this Court upheld as *res judicata* a prior holding in a declaratory judgment action between the two insurers that "both [insurers] had provided coverage for [the carrier] at the time of the accident" and thus, the former (the National Indemnity equivalent) was "liable due to" the MCS-90 provisions "of the policy." *Id.* at 1297. That illustrates that an insurer can be liable under its MCS-90 even though another insurer might also be liable for same carrier, which precludes National Indemnity's proposed limitation.

*Empire Fire* also cited *Carolina v. Underwriters,* 569 F.2d at 309, cited at Section 2.D., above. There, the Court held that the insurer "cannot disavow its primary insurer status on the theory that public policy demands that this

Page 52 of 60

be pushed off onto" the other insurer due to its MCS-90 policy. *Id.* at 313. That illustrates that an insurer can be liable even though another insurer might also be liable for the same carrier via its MCS-90.

Although those two cases do not involve the precise circumstances here, they confirm that an insurer can be liable, including under an MCS-90, even when another insurer can also be liable, including under an MCS-90, for a judgment against the same carrier. In other words, the possibility that a plaintiff could recover from another source doesn't preclude him from recovering under an MCS-90 for a triggering judgment. *See also Carolina Cas. Ins. Co. v. Cap. Trucking, Inc.*, 523 F. Supp. 3d at 676 ("[T]he federally mandated insurance obligations of one carrier cannot be satisfied simply by virtue of the fact that an injured party recovers an award greater than the federal minimum from another party.").

Beyond multiple endorsements, numerous courts have confirmed that an insurer can be liable under its MCS-90 for more than the minimum limits if the "policy limits" listed in the MCS-90 are higher amount than those minimums. *See, e.g., Fairmont*, No. 2:10 CV 070, 2012 WL 2343662, at *3 (collecting cases). As explained above, that is why Old Republic was liable for $1 million, not just $750,000. And if that's true of one insurer, there is no reason a

plaintiff cannot recover more than the minimum across *multiple* insurers.

### C.    National Indemnity's cases don't demand a different result.

To support its proposed rule, National Indemnity would have to point to caselaw *prohibiting* recovery under two MCS-90s that cover the same negligent carrier. It identifies no such case. Faced with the cases and plain language above, that failure is fatal. Yet to be thorough, we address two possible explanations for its argument, neither of which carries the day.

*First*, National Indemnity simply asserts that it "is not aware of a single decision, until the decision below, which held that multiple MCS-90 endorsements apply…." 11th Dkt. 30 at 49 *et seq.* It then spends the bulk of its Argument § III summarizing several cases which supposedly support that assertion. But, as a matter of basic logic, the absence of such a case doesn't prove the negative—that recoveries via multiple MCS-90s are prohibited. The cases we discussed above refute that conclusion.

*Second*, National Indemnity points to *Carolina Casualty v. Yeates*, 584 F.3d. 868 (2009). 11th Dkt. 30 at 51. At the outset, we acknowledge, as we did below, that *Yeates* "*may* suggest a limitation on imposing MCS-90 liability" on multiple insurers under certain circumstances. Dkt. 104 at 13 (emphasis added). But *Yeates*'s limitation does not apply here, for two reasons.

*First*, *Yeates* involved a key differentiating fact: one of the negligent carrier's insurers settled the underlying case for $750,000 before judgment based on its policy coverage. The Seventh Circuit held that the "$750,000 payment satisfied [the insured's] minimum financial responsibility requirements under federal law and the MCS–90 endorsement attached to the Carolina Casualty policy does not supply additional coverage." 584 F.3d. at 888. Here, of course, the underlying case didn't settle.

Instead, Mr. Cagle obtained a judgment against One Way and then, without anything to show for it, proceeded against One Way's insurers. Both those insurers continued to deny that they were liable under their MCS-90 through judgment against them. That renders *Yeates's* holding inapplicable.

*Second*, even if *Yeates* applies, this case meets its requirements. *Yeates* imposes two additional requirements for MCS-90 exposure: "(1) the underlying insurance policy to which the endorsement is attached does not otherwise provide coverage, and (2) either no other insurer is available to satisfy the judgment against the motor carrier, or the motor carrier's insurance coverage is insufficient to satisfy the federally-prescribed minimum levels of financial responsibility." 584 F.3d at 878.

Here, it is undisputed that National Indemnity's "policy… does not

otherwise provide coverage." *Id.* It is also undisputed that, before judgment

in *Cagle II's*, there was "no other insurer is available to satisfy the judgment"

against One Way.[13] *See, e.g., Carolina Cas. Ins. Co. v. Cap. Trucking, Inc.*, 523 F.

Supp. 3d at 677 ("the two-part test in Yeates to establish the application of

an MCS-90 endorsement is satisfied").

On that latter point, National Indemnity points to Old Republic as be-

ing "available to satisfy the judgment." But, per above, that could only apply

if *Old Republic had settled the underlying case*. It didn't. That limitation cannot

mean that a plaintiff is prevented from recovering when both insurers deny

liability at the time of judgment—otherwise, both could rely on the possibil-

ity that the other's *possible* liability excuses their own, leaving a whipsawed

---

[13] In another case, this Court might well consider whether *Yeates's* two-part test is properly grounded in the applicable texts. To derive those requirements, the court started with what it perceived as an ambiguity in the text arising when multiple insurers were claiming the other was the primary insurer. To address that perceived ambiguity, the court outlined its test based on what it believed to be the policy considerations under the FMCSA. But that ambiguity arises only in that situation (if at all) where insurers are competing as to who is the primary. Courts after *Yeates* have cited those requirements without further consideration, including this Court in its unpublished opinion in *Martin-Vegue*, 644 F. App'x at 906, and the district court below, Dkt. 113 at 17. But ultimately, because *Yeates* doesn't apply here anyway, those requirements are not at issue, and so the Court need not address them.

plaintiff without any remedy.[14] That would also directly violate this Court's directive in *Carolina v. Underwriters,* 569 F.2d at 309, that an insurer "cannot disavow its primary insurer status on the theory that public policy demands that this be pushed off onto" the other insurer due to its MCS-90 policy. *Id.* at 313. That is why *Yeates* applies only to its facts, where one insurer "[w]ithout much delay… tendered the policy limits." 584 F.3d at 871.

Instead, as outlined above, the district court's holding that both insurers are liable under their respective MCS-90s aligns with this Court's precedent and — more pertinently — with the terms of those respective MCS-90s.

This Court should affirm that holding and affirm as to Issue 3.

**4.    The Court should affirm the discretionary holding that judicial estoppel doesn't preclude recovery.**

National Indemnity's final argument about judicial estoppel is a meritless sideshow. It appeals the District Court's discretionary and correct ruling rejecting its claim that judicial estoped applies here. For any one of several reasons, the Court should reject this argument.

*First*, because this argument affects the question of which carrier's

---

[14] For the same reason, *Yeates* does not preclude recovery against National Indemnity even though the judgment against Old Republic is now final.

"authority" applied to the wreck truck, it can only matter if National Indemnity's "authority" limitation, discussed in Section 2, applied. But for all the reasons above, it doesn't. When resolving Issue 2, if the Court determines (as it should) that there is no legal basis for an "authority" limitation for MCS-90 liability, then this estoppel argument goes away entirely. (Thus, for purposes of the remaining arguments in this Section only, we reluctantly assume that such a limitation could apply.)

*Second*, National Indemnity's argument rests on mischaracterizations of the record. We touched on this argument in our Response to its Motion to Supplement, 11th Dkt. 48, and we incorporate that Response here.

*Third*, Mr. Cagle never took inconsistent positions. In *Cagle I*, when opposing Wesco's Motion for Summary Judgment, Mr. Cagle acknowledged that its insured (First Time) was the company whose placard applied to the wreck. Later in *Cagle II*, Mr. Cagle argued—as epitomized by those sections' headings—that First Time's "placard liability does not establish sole for-hire status" and "First Time's DOT 'authority' does not define Defendants' MCS-90 surety obligations." Dkt. 104 at 10–11 (sentence case format added). For all the reasons discussed above in Section 2, those arguments weren't inconsistent then, and they aren't inconsistent now.

*Fourth*, even assuming Mr. Cagle had adopted inconsistent positions, also, as we noted before, judicial estoppel requires a showing that the party "succeeded in persuading a court to accept his earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *United States v. Munoz*, 112 F.4th 923, 935 (11th Cir. 2024). Yet here, as we noted in our prior Response, Mr. Cagle didn't "succeed" in his *Cagle I* summary judgment Motion against Wesco — the district court denied that motion. That prevents judicial estoppel from coming into play.

By the same token, in ruling on this issue in *Cagle II*, the district court — in its discretion — confirmed that he wasn't hoodwinked. So for this Court to rule in National Indemnity's favor, it would have to determine that the *same judge who oversaw both cases* somehow *abused his discretion* in deciding that *he wasn't misled*, even when he was prompted to consider that very question by National Indemnity's argument in its Motion. That is an absurd notion, and it deserves no further consideration.

## Conclusion

The District Court correctly ruled on all the pertinent issues. National Indemnity cannot demonstrate any error (or abuse of discretion). Its

industry-preferred policy arguments lack any basis in the MCS-90's terms, the pertinent regulations' text, and the applicable caselaw. Accordingly, this Court should **affirm** the grant of summary judgment for Mr. Cagle.

*[Signature and certificate pages follow.]*

This 29th day of September, 2025.

*/s/ E. Allen Page*
Naveen Ramachandrappa
E. Allen Page
BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, NW
Suite 3900
Atlanta, GA 30309
Tel: 404-881-4100
Fax: 404-881-4111
ramachandrappa@bmelaw.com
page@bmelaw.com

Mark Alexander
STEWART, MELVIN & FROST, LLP
P.O. Box 3280
Gainesville, Georgia 30503
Tel: 770-536-0101
Fax: 678-207-2002
malexander@smf-law.com

Andrew Q. Gould
PRINCENTHAL MAY & WILSON
750 Hammond Dr.
Building 12 Suite 200
Sandy Springs, GA 30328
Tel: 678-534-1980
andrew@princemay.com


*Attorneys for Freddie Cagle*

## Certificate of Compliance

I certify that this filing complies with the applicable requirements of Fed. R. App. P. 32(a) and local rules because it uses 14 pt. Book Antiqua font and contains 12,871 applicable words, which is fewer than the limit of 13,000.


/s/ E. Allen Page
E. Allen Page

**Certificate of Service**

I certify that, on September 29th, 2025, I filed Appellee-Plaintiff Freddie Cagle's **Response Brief** using the ECF system, which will give notice and serve this document on the following counsel of record:

> Mark A. Barber
> Melody Demasi
> BAKER, DONALDSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
> mbarber@bakerdonelson.com
> mdemasi@bakerdonelson.com
>
> Laurence J. Rabinovich
> BARCLAY DAMON, LLP
> lrabinovich@barclaydamon.com

*Attorneys for Appellant National Indemnity Company of the South*

> /s/ E. Allen Page
> E. Allen Page